Opinion issued December 29, 2011

 



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-08-00969-CV

———————————

Pitts & Collard, L.L.P. and Gary Pitts, Appellants

V.

Arthur L.
Schechter, Arthur L. Schechter, P.C. d/b/a Schechter & Associates,
Schechter & Marshall, L.L.P., and Schechter, McElwee & Shaffer, L.L.P., Appellees

and

Arthur L. Schechter, Arthur L. Schechter, P.C. d/b/a Schechter &
Associates, Schechter & Marshall, L.L.P., and Schechter, McElwee &
Shaffer, L.L.P., Appellants

V.

Pitts &
Collard, L.L.P. and Gary Pitts, Appellees



 



 

On Appeal from the 157th District
Court

Harris County, Texas



Trial
Court Case No. 2005-59482

 



 

OPINION ON REHEARING*

Gary Pitts
and Pitts & Collard, LLP sued Arthur L. Schechter, Arthur L. Schechter,
P.C. d/b/a Schechter & Associates, Schechter & Marshall, L.L.P., and
Schechter, McElwee & Shaffer, L.L.P. for breach of contract.  The contract claim was based upon an
allegation that the Schechter parties failed to pay referral fees from nearly a
thousand lawsuits that Pitts referred by way of nine letter agreements.[1]  Pitts also sued the Schechter parties for
breach of a subsequent 1995 agreement, which also pertained to fees and
expenses from certain referred cases.

Schechter raised several
affirmative defenses, countersued for breach of contract based on the nine
letter agreements, and sued for defamation and abuse of process.  He alleged that as retribution for the
dispute over referral fees, Pitts made slanderous statements to the Houston
City Council before approval of his nomination to serve as the Chairman of the
Metropolitan Transit Authority of Harris County.  Schechter also alleged that Pitts slandered
him to professional colleagues, interfered with his client relationships by
sending letters informing the clients they were being charged interest on their
litigation expenses and informing them how to file a grievance, and abused the
litigation process by failing to file certain exhibits under seal as the trial
court had ordered.  Both parties raised various
affirmative defenses, and the case was tried to a jury.

After considering the jury’s
verdict, numerous post-trial motions, and the applicable law as provided by the
parties, the trial court entered judgment as follows:

·       
take-nothing judgment against Pitts on the breach-of-contract claim
pertaining to the nine letter agreements, based on the jury’s answers to
questions about Pitts’s prior breach, prior repudiation, and the commercial
impracticability of the agreements; 

·       
judgment for the Schechter parties, including attorney’s fees, on their
breach-of-contract claim pertaining to the letter agreements; 

·       
judgment for Pitts on the breach-of-contract claim pertaining to the 1995
contract; 

·       
take-nothing judgment against Schechter on his claims pertaining to Pitts’s
communication with the clients; 

·       
judgment for Schechter for compensatory and punitive damages on the
abuse-of-process claim; 

·       
judgment for Schechter for compensatory and punitive damages on the
defamation claim that alleged Pitts slandered him to his colleagues; and 

·       
judgment not withstanding the verdict in favor of Pitts on Schechter’s
defamation claim relating to statements made before the Houston City Council because
these claims were barred by limitations. 


Both Pitts and Schechter filed notices of appeal addressing
both the contract and tort parts of the underlying case.  We affirm the trial court’s judgment
pertaining to the contract claims and the non-economic and exemplary damages
awarded under Schechter’s professional colleague defamation cause of action.  We reverse and render judgment that Schechter
take nothing by way of economic damages for his professional colleague
defamation cause of action, and we reverse and render a take-nothing judgment
on Schechter’s abuse of process cause of action.

I.                 
Background

          In the early
1990s, attorney Gary Pitts and his law partner, Ed Collard, advertised about
the product liabilities associated with silicone breast implants.  As a result of their advertising campaign,
over a thousand women retained Pitts & Collard to pursue possible
claims.  The major manufacturers of
silicone breast implants announced a global settlement in September 1993, after
negotiations with a plaintiffs’ steering committee in a federal lawsuit filed
in Alabama.  Any woman with silicone
breast implants could opt into this settlement. 
One feature of this settlement was that an opt-in claimant’s attorney’s
contingency fee would be reduced to 25%. 
The settlement was approved by the federal district court in early 1994.

From late 1993 through 1994, in a
series of nine letter agreements, Pitts & Collard referred approximately 1,000
clients to the law firm of attorney
Arthur L. Schechter.  Each such agreement
referred to the lawyers’ prior agreements and course of dealing, which included
a 60/40 split of attorney’s fees on a fees-recovered basis, with the larger
amount going to Schechter’s firm and the balance to Pitts & Collard.  After the second such letter agreement was
signed, the lawyers jointly sent a letter to their clients stating that they
would share the work and share the fee received from their cases.  The client letter indicated that Richard Melancon,
an attorney associated at that time with Schechter, would have day-to-day
responsibility for their cases.

          Initially, the
lawyers thought this would be a lucrative arrangement because of the global
settlement.  But in the summer of 1995, one
of the largest manufacturers of silicone breast implants, Dow Corning, sought
bankruptcy protection.  The global
settlement was revised to apply only to claims against the other major implant manufacturers.  The lawyers continued to advocate actively
for the clients in cases that did not involve Dow Corning.

          A dispute
arose in 1995, and Pitts sued Schechter, alleging that the cases were being
mismanaged.  That lawsuit settled after
mediation.  As part of the settlement,
the parties referred almost 400 of the breast-implant cases to attorney Richard
Laminack.  However, Laminack refused to
take any cases against Dow Corning.

          Schechter
argues that Pitts stopped working on the cases in 1996, although Schechter
continued to represent the clients and pay Pitts referral fees until late
1997.  The revised global settlement
ended in 1999.  At that time, only the
Dow Corning cases remained from the cases referred by Pitts to Schechter.  But the Dow Corning bankruptcy court had
dramatically reduced the fees recoverable by claimants’ attorneys, and in some types
of cases, the federal court had disallowed attorney’s fees entirely.  This resulted in a financial loss to the
attorneys, particularly Schechter, who had fronted expenses in the cases.  In 2001, Pitts sought arbitration under the
1995 settlement agreement, alleging that Schechter was not properly sharing
fees.  In March 2002, the parties
arbitrated the dispute, which was resolved in Schechter’s favor.

          Meanwhile, by
April 2002, Schechter had been appointed to the board of directors of the Metropolitan Transit Authority of Harris
County, and he was under consideration to become the chairman.  On April 2, 2002, approximately two weeks
after the arbitration, Pitts spoke at a public meeting of the Houston City
Council, insinuating that Schechter was difficult, dishonest, and unethical in
the conduct of his business and political affairs.  These comments were recorded and broadcast
through local-access cable television. 
Pitts implored the city council to investigate Schechter and to begin by
speaking to his former colleagues and law partners.  Pitts also spoke to some of Schechter’s
former associates and partners about his appointment to the METRO board and the
consideration of him for its chairmanship. 
He told Melancon and other former colleagues of Schechter that someone
from city council might contact them to discuss their private opinions about
Schechter.

          Pitts became
aware in 2004 that Schechter had begun charging the clients interest on the
expenses paid on the contingent-fee cases. 
Pitts informed the clients that this practice was not part of their
contingent-fee arrangement.  He also told
them how to file a grievance with the State Bar.  Subsequently, Schechter stopped charging the
clients interest.

          Pitts sued
Schechter in 2005 for breach of contract and other claims, alleging that
Schechter owed him attorney’s fees from the nine letter agreements.  Pitts generally contended that he was
entitled to share in the attorney’s fees recovered, and that Schechter was not
entitled to an offset for losses in those cases resulting only in a loss.  Schechter took the opposite position, arguing
that the losses in some cases should be offset against the attorney’s fees
collected in other cases.  Schechter also
countersued for breach of contract, alleging that Pitts did not share the
litigation work and that Schechter had to hire other people to do the
work.  Finally, Schechter sued for
defamation related to the comments that Pitts made before city council in 2002
and repeated to Schechter’s professional colleagues.  During the course of litigation, Pitts repeatedly
filed a recording of the statements he made before city council, but he did not
file them under seal as required by a protective order entered by the trial
court at the agreement and request of the parties.  As a result, Schechter added a claim for
abuse of process.      

II.              
Claims arising from joint representation

Both parties appeal from various
aspects of the judgment relating to disputes over their joint representation of
the breast-implant clients.  Pitts
challenges the judgment against him for breach of contract.  Schechter challenges the rejection of some of
his contract claims on limitations grounds as well as the rejection of his
claim that the parties had a joint venture which gave rise to a duty of good
faith and fair dealing that was allegedly breached by Pitts.  Both parties raise issues relating to attorney’s
fees. 

A.  
Pitts’s
appeal concerning the nine letter agreements

The jury found that Pitts was first
to breach the nine letter agreements and that Schechter’s breach was excused by
Pitts’s repudiation and by commercial impracticability.  The trial court entered judgment on the
jury’s verdict in Schechter’s favor.  Pitts
raises numerous appellate issues pertaining to his contract claim, arguing that
the trial court erred in failing to render judgment in his favor.  He disputes the legal and factual sufficiency
of the evidence supporting three affirmative defenses asserted by Schechter:
prior breach, prior repudiation, and commercial impracticability.  He also asserts that the trial court should
not have set aside the jury’s finding that Schechter failed to pay fees because
Schechter elected to continue the contract and thereby waived his opportunity
to have his obligations discharged.

1.    
Prior
breach by Pitts

Pitts argues that there was no
evidence, or legally and factually insufficient evidence, to support the jury’s
verdict that he was first to breach the nine letter agreements by not sharing
the litigation work. In a legal sufficiency, or “no-evidence” review,[2] we determine whether the
evidence would enable reasonable and fair-minded people to reach the verdict
under review.  City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005).  In making this determination, we credit
favorable evidence if a reasonable fact-finder could, and we disregard contrary
evidence unless a reasonable fact-finder could not.  Id.  We consider the evidence in the light most
favorable to the finding under review and indulge every reasonable inference
that would support it.  Id. at 822.  So long as the evidence falls within the zone
of reasonable disagreement, we may not substitute our judgment for that of the
fact-finder.  Id.  The trier of fact is the
sole judge of the credibility of the witnesses and the weight accorded to their
testimony.  Id. at 819.  Although we
consider the evidence in the light most favorable to the challenged findings,
indulging every reasonable inference that supports them, we may not disregard
evidence that allows only one inference. 
Id. at 822.

In a factual-sufficiency review,[3] the court must examine both
the evidence supporting and contrary to the judgment.  See Dow
Chem. Co. v. Francis, 46 S.W.3d 237, 242 (Tex. 2001); Plas-Tex, Inc. v. U.S. Steel Corp.,
772 S.W.2d 442, 445 (Tex. 1989).  In
reviewing a factual-sufficiency challenge to a jury finding on an issue on
which the party did not have the burden of proof, we consider and weigh all of
the evidence and set aside the verdict only if the evidence that supports the
jury finding is so weak as to make the verdict clearly wrong and manifestly
unjust.  Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986); Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co., 766 S.W.2d
264, 275 (Tex. App.—Amarillo 1988, writ denied).  The fact-finder is the sole judge of the
witnesses’ credibility and the weight to be given their testimony, and the
fact-finder may choose to believe one witness over another.  See Golden Eagle Archery, Inc. v. Jackson,
116 S.W.3d 757, 761 (Tex. 2003).  Because
it is the fact-finder’s province to resolve conflicting evidence, we must
assume that the fact-finder resolved all evidentiary conflicts in accordance
with its decision if a reasonable person could have done so.  See id.  An appellate court may not impose its own
opinion to the contrary of the fact-finder’s implicit credibility
determinations.  Id.

a.     Ambiguity of agreements

Pitts’s legal argument that he had no
obligation to share the litigation work relies upon the text of the nine letter
agreements, which he contends was unambiguous in that regard.  “When construing a contract, the court’s
primary concern is to give effect to the written expression of the parties’
intent.”  Forbau v. Aetna Life Ins. Co., 876 S.W.2d 132,
133 (Tex. 1994); see Tellepsen Builders,
L.P. v. Kendall/Heaton Assocs., Inc., 325 S.W.3d 692, 695 (Tex.
App.—Houston [1st Dist.] 2010, pet. denied). 
Whether a contract is ambiguous is a question of law, which we review de
novo.  See Coker v. Coker, 650 S.W.2d 391, 394 (Tex. 1983); Tellepsen Builders, 325 S.W.3d at 696.

A contract is not ambiguous if its
wording permits a definite or certain legal meaning.  DeWitt
Cnty. Elec. Coop., Inc. v. Parks, 1 S.W.3d 96, 100 (Tex. 1999); Nat’l Union Fire Ins. Co. v. CBI Indus.,
907 S.W.2d 517, 520 (Tex. 1995).  A
contract is ambiguous if, after applying established rules of construction, its
meaning is uncertain and doubtful or the writing is reasonably susceptible to
more than one meaning.  DeWitt Cnty. Elec. Coop., 1 S.W.3d at 100;
Coker, 650 S.W.2d at 393.  In determining whether a contract is
ambiguous, courts construe and harmonize all provisions of the contract to
discern the parties’ intent.  Coker, 650 S.W.2d at 393–94; Tellepsen Builders, 325 S.W.3d at 695.  This inquiry also considers the context of the
agreement of the parties and the circumstances present when the agreement
arose.  Friendswood Dev. Co. v. McDade + Co., 926 S.W.2d 280, 282 (Tex. 1996).
 To discern the contracting parties’
intent, courts may properly consider all writings pertaining to the same
transaction, even if the writings were executed at different times and do not
expressly refer to one another.  DeWitt Cnty. Elec. Coop., 1 S.W.3d at 102;
see also Miles v. Martin, 159 Tex.
336, 341, 321 S.W.2d 62, 65 (1959) (“It is well settled that separate
instruments executed at the same time, between the same parties, and relating
to the same subject matter may be considered together and construed as one
contract.  This undoubtedly is sound in
principle when the several instruments are truly parts of the same transaction
and together form one entire agreement.” (citation omitted)).

A writing is not ambiguous merely
because it lacks clarity or because a disagreement in interpretation arises.  DeWitt
Cnty. Elec. Coop., 1 S.W.3d at 100; Tellepsen
Builders, 325 S.W.3d at 696.  “The
parties’ interpretation of a contract is parol evidence, and parol evidence is
not admissible to create an ambiguity.” 
Zurich Am. Ins. Co. v. Hunt
Petroleum (AEC), Inc., 157 S.W.3d 462, 465 (Tex. App.—Houston [14th
Dist.] 2004, no pet.) (citing Friendswood
Dev. Co., 926 S.W.2d at 283).  Likewise,
parol evidence of the parties’ intent is not admissible to vary the terms of an
otherwise unambiguous instrument.  See Estes v. Rep. Nat’l Bank, 462 S.W.2d
273, 275 (Tex. 1970).  For parol evidence
of the parties’ intent to be admissible, the contract must first be ambiguous
as a matter of law.  See id.

          On
appeal, as in the trial court, Pitts argues that the jury should have been
restricted to considering only the written language in the nine letter
agreements.  The charge asked the jury to
determine if either Arthur L. Schechter, P.C. or Pitts & Collard, L.L.P.
failed to comply with the nine letter agreements.  The jury was instructed that it could
consider parol evidence.  All the letter
agreements were substantially the same, and provided as follows:

1.                
November 5, 1993.  “This letter
will confirm that we are referring the attached one hundred (100) cases to be
handled by Richard Melancon, Esq. of your law firm on our usual 60%/40% split
of attorney’s-fees-recovered basis, with the larger amount to your firm, and
the balance to our firm. . . .  We would
also like to be copied in on significant pleadings and correspondence and have
the option of attending the trial of any of these cases in a ‘second chair’
status.  Our referral of these cases and
this agreement are irrevocable, and we appreciate your firm’s assistance in
this matter. . . .  Again, we thank you
for your involvement and look forward to working with you on these cases and
additional cases in the future.”

2.                
December 31, 1993.  “This letter
will confirm that we are referring the attached five hundred seventy-one cases
to Richard Melancon, Esq. of your law firm on our usual 60%/40% split of
attorney’s-fees-recovered basis, with the larger amount to your firm, and the
balance to our firm. . . .  Our referral
of these cases and this agreement are irrevocable, and we appreciate your
firm’s assistance in this matter. . . .  Again,
we thank you for your involvement and look forward to working with you on these
cases and additional cases in the future.”

3.                
March 10, 1994.  The letter retracted
13 files that were mistakenly referred and referred an additional 298 cases “on
the same 60%-40% referral basis as set out in our December 31, 1993, letter
regarding the previous 571 cases.”  It
concluded, “We look forward to working with you on these cases and on other
matters in the future.”

4.                
March 26, 1994.  This letter
referred an additional 114 cases, again referred to the letter of December 31,
1993, and stated: “We look forward to working with you on these cases and on
other matters in the future.”

5.                
May 5, 1994.  This letter referred
an additional 17 cases, again referred to the letter of December 31, 1993, and
stated: “We look forward to working with you on these cases and on other
matters in the future.”

6.                
May 19, 1994.  This letter referred
an additional 21 cases, again referred to the letter of December 31, 1993, and
stated: “We look forward to working with you on these cases and on other
matters in the future.”

7.                
June 10, 1994.  This letter
referred an additional 9 cases, referred to the letter of December 31, 1993,
and stated: “Thank you for your attention and assistance in these and other
matters.”

8.                
August 19, 1994.  This letter
referred 3 cases and referred to the December 31, 1993 letter.  It concluded, “Thank you for your attention
and cooperation in these and other matters.”

9.                
September 9, 1994.  This letter
referred one case and referred to the December 31, 1993 letter.  It concluded, “Thank you for your attention
and cooperation in these and other matters.”

 

On January 31 1994, Pitts and Melancon sent a joint
letter, on Pitts & Collard, L.L.P. letterhead, to the clients whose cases
had been referred to Schechter.  This
letter stated:

A
lawsuit has been filed in Federal Court on your behalf by the Law Offices of
Pitts & Collard, LLP, in association with the Law Offices of Schechter
& Associates.  Our two offices will work together on your case, but
Schechter & Associates and its staff will do most of the day-to-day work with you and you should report
important events to them and cooperate with their staff as fully as you have to
date with Pitts & Collard, LLP. . . .  Both our
firms will share the work and share the fee in your case. . . . 

 

(Emphasis supplied.)

Under the Rules of Disciplinary
Conduct, a client must consent in writing to a referral agreement to give it
effect.  See Tex. Disciplinary R. Prof’l Conduct 1.04(f)(2), reprinted in Tex. Gov’t Code Ann., tit. 2, subtit. G app. A (West 2005)
(Tex. State Bar R. art X, § 9).  In particular,
Rule 1.04(f) states:

A division or arrangement for division of a
fee between lawyers who are not in the same firm may be made only if . . . the
client consents in writing to the terms of the arrangement prior to the time of
the association or referral proposed, including . . . whether fees will be
divided based on the proportion of services performed or by lawyers agreeing to
assume joint responsibility for the representation . . . .

Id.  The letter that Pitts and Melancon sent on
January 31, 1994 was the mechanism by which the lawyers solicited the clients’
consent, which was required to effectuate the referral and fee-sharing
agreement.  Therefore this letter
pertains to the same transaction as the nine letter agreements, and we must
consider it in determining the parties’ intent and whether the contracts were
ambiguous.  See DeWitt Cnty. Elec. Coop., 1 S.W.3d at 102.  Based on the nine letter agreements and the
letter that the lawyers sent to their clients, we find that their meaning is
uncertain and doubtful with respect to the disputed questions of whether and to
what extent the two law firms would divide professional responsibilities for
the preparation of cases on behalf of their joint clients.  While the letters stated that referred cases
would be “handled by” Melancon, they also referenced the two firms “working”
together, Pitts reserved the option to act as second-chair counsel, and the
letter to clients stated that the firms would “work together” and “share the
work.”

Because the agreement was
reasonably susceptible to more than one meaning, we hold that the nine letter
agreements were ambiguous in regard to this question and that the trial court
did not err by permitting the jury to consider parol evidence in answering the
breach-of-contract question.  See id. at 100; Coker, 650 S.W.2d at 393–94.

b.    Sufficiency of evidence

Agreement
to share work.  As noted
above, the nine letter agreements and the letter to clients soliciting their
consent to the referrals contain statements suggesting an intent for the lawyers
to continue working together on the clients’ cases.  For example, the first six letters from Pitts
to Schechter stated, “We look forward to working with you on these cases.”  The letter to the clients said, “Both our
firms will share the work and share the fee in your case.”

Because the parties’ agreement was
ambiguous about the division of work responsibilities, the jury was entitled to
consider parol evidence, such as the parties’ testimony about the
agreement.  Schechter testified that
their “deal at the time” was that they would handle the cases jointly.  Regarding the client letter, Schechter
testified:

To
me that meant that we were going to jointly handle this mass-tort case as a
project, that we were going to work on it together, that I was going to be
responsible for setting up what needed to be done, Richard Melancon and Gary
Pitts were going to be the lead counsel in the litigation; and then there was
an understanding that if the case actually had to be litigated at some point
down the line, that I would become involved in the active litigation, that as
far as the project itself goes, you know, it was going to be a joint deal.

 

In March 1994, Pitts and Melancon
(on behalf of Schechter’s firm), sent a joint litigation update to their
clients, on Pitts & Collard letterhead, which suggests that the parties
were working together on the cases.  The
same month, a memorandum from Pitts to Collard, Schechter, and Melancon
detailed a litigation plan, which specified how the four lawyers should share
the work of interviewing their clients. 

          Two
months later, Pitts sent a memo to “Task Force Leader Schechter” about the referred
implant cases.  Pitts requested a change
to the affidavits they were asking their clients to sign.  The memo stated: “At the bottom of the
affidavit we ask that you change it to: ‘This will further ratify that my
attorneys, Pitts & Collard, L.L.P. have associated Arthur Schechter &
Associates in my case.’”  In addition,
Pitts stated, “We appreciate your trying to set up modem ability between our
computers.  This will save everyone a lot
of time.”  Based on this and other parts
of the record, we conclude that the evidence is legally sufficient to support the
jury’s verdict that the parties agreed to share the litigation work.  See
City of Keller, 168 S.W.3d at 827.

          Prior breach by Pitts.  Two breast-implant clients
testified.  One testified that based on
the January 1994 letter, she expected both law firms to work together on her
case, but she received no regular correspondence from Pitts or his firm.  She testified that from 1994 through 2004,
she had no indication that Pitts was working on her case, and she believed he had
simply stopped working on it.  She
testified that she believed Pitts abandoned her case around 1994 or 1995,
stating: “I thought they fell off the edge of the world.”

          Another
client also testified that based on the January 1994 letter, she believed the
law firms would work together to represent her. 
However, she testified that Pitts had done no work on her case since
around the time Dow Corning filed for bankruptcy, approximately mid-1995.  Regarding Pitts & Collard’s involvement,
she said, “[T]hey never called me after the initial visit . . . .
They didn’t do any work.  They never
contacted me.”

          Schechter
testified that he was the only attorney handling these cases since 2002 and
that Pitts stopped working with him years before that.  He testified that “after 1995 basically there
really wasn’t any reason for me to assert much of anything to try to get their
help.  And after 1996, they continued to
give instructions on the file but would not do anything to help or
participate.”  Schechter paid Pitts 40%
of the attorney’s fees received in the referred cases until October 1997, at
which time Schechter instructed his staff to set the fees due to Pitts aside in
a separate account.  A paralegal who
worked for Schechter testified that Schechter sent at least one additional
check to Pitts after 1997, but Pitts did not cash it.  Schechter testified that he continued to
communicate with Pitts and send him copies of client settlement statements
through 1998.  Even Pitts acknowledged
that the letter he sent the clients in 2004 regarding Schechter’s assessment of
interest was his first communication with the clients in approximately eight years.

Viewing the evidence in the light
most favorable to the verdict, we conclude that the evidence was legally
sufficient to enable reasonable jurors to conclude that Pitts agreed to share
the litigation work, Pitts stopped sharing the litigation work in approximately
1996, and Schechter continued to pay Pitts under the agreement through
1997.  We hold that the evidence was therefore
legally sufficient to show that Pitts breached the contract first.  See
City of Keller, 168 S.W.3d at 827.

We also hold that the evidence was
factually sufficient to support the jury’s verdict as to Pitts’s prior breach
and that the trial court did not abuse its discretion in denying Pitts’s motion
for new trial.  Central to Pitts’s
factual-sufficiency issue are his contentions that he never agreed to share the
work and that the writings between the parties did not evidence any agreement
or obligation for him to share the litigation work.  Pitts testified to this throughout the
trial.  The jury’s determination about
Pitts’s prior breach depended heavily on its interpretation of the contract,
which, in turn, depended on an evaluation of the credibility of the
witnesses.  Simply put, the parties
disagreed about the meaning of their agreement. 
We may not overrule the jury’s implicit credibility determinations.  Golden
Eagle Archery, 116 S.W.3d at 761. 
For this reason, and based on the evidence in the record, we conclude
that the evidence supporting the jury’s finding as to prior breach was not so
weak as to make the verdict clearly wrong and manifestly unjust.  See
Cain, 709 S.W.2d at 176.

Because we must affirm the trial
court’s judgment on any legal theory that is supported by the evidence and the
jury’s verdict, we need not consider Pitts’s arguments about the legal and
factual sufficiency of the evidence to support Schechter’s other affirmative
defenses.  See Worford v. Stamper,
801 S.W.2d 108, 109 (Tex. 1990).

2.    
Effect of
Schechter’s continuing representation of the joint clients

Despite legally sufficient evidence
supporting the jury’s verdict on Schechter’s affirmative defense of prior
breach, Pitts contends that Schechter waived his right to assert prior breach
by electing to continue the contract.  The
argument is that if Schechter believed Pitts had breached the agreements first,
he could have ceased performance and sued for breach of contract in 1996 or
found substitute counsel.  Under this
theory, because Schechter chose to continue, Pitts contends that he remained
obligated to share the fees he collected.[4]  See,
e.g., Hanks v. GAB Bus. Servs., Inc.,
644 S.W.2d 707, 708 (Tex. 1982) (“A party who elects to treat a contract as
continuing deprives himself of any excuse for ceasing performance on his own
part.”); Henry v. Masson, 333 S.W.3d
825, 840 (Tex. App.—Houston [1st Dist.] 2010, no pet.).  In response, Schechter argues that his
continued representation of the clients should not be given any such effect
because he owed duties arising from the attorney-client relationship independent
of the fee arrangement with Pitts.

Pitts wrongly assumes that
Schechter treated his failure to share work as a partial breach (which, by his
conduct, Schechter purportedly elected to waive) rather than a total breach of
their agreement (terminating Schecter’s obligation to perform and giving rise
to the claim for damages).  Pitts
identifies no actions by Schechter that constituted a continuation of the
agreement between them other than continuing to “operate” under the letter
agreements and “accept the benefits of the agreements,” meaning that he
continued to render services to the joint clients and collect a fee.  Just as a landowner exercising his
independent rights over his property may move into a defective home without
thereby waiving complaints against the builder who breached a construction
contract, see E. Allan Farnsworth,
Contracts § 8.19, at 598 (3d ed. 1999) (citing Cawley v. Weiner, 140 N.E. 724, 725 (N.Y. 1923)), we decline to hold that Schechter waived his
claims against Pitts by continuing to honor his independent obligations to his
clients.  The Texas Disciplinary Rules of
Professional Conduct do not authorize Pitts or Schechter to terminate
representation of their joint clients based upon a dispute between them about
division of labor or sharing of fees.  See generally Tex. Disciplinary R.
Prof’l Conduct 1.15, reprinted in
Tex. Gov’t Code Ann., tit. 2,
subtit. G app. A (West 2005) (Tex. State Bar R. art. X, § 9).  We therefore conclude that Schechter’s
continued representation of the joint clients did not, in and of itself,
constitute an election to treat the fee-sharing agreement as a continuing
contract or otherwise absolve Pitts of the consequences of his breach.  We hold that the trial court did not err in
rendering judgment on the jury’s verdict, which found that Schechter’s breach
of the nine letter agreements was excused. 

*        *        *

Having found that the evidence is
legally and factually sufficient to support Schechter’s affirmative defense of
prior breach, we hold that the trial court did not err by rendering a
take-nothing judgment against Pitts on his breach of contract claim pertaining
to the letter agreements.

B.  
Schechter’s
appeal concerning existence of joint venture and duties of good faith and fair
dealing

In Schechter’s appeal, he argues
that the trial court erred by refusing to submit jury questions regarding the
existence of a joint venture and whether, in the event a joint venture existed,
Pitts breached his resulting duty of good faith and fair dealing.  Schechter tendered to the court requested
jury instructions on joint venture and breach of the duty of good faith and
fair dealing, in substantially correct wording. 
The issue therefore is preserved for our review.  Tex.
R. Civ. P. 278; ASEP USA, Inc. v.
Cole, 199 S.W.3d 369, 376 (Tex. App.—Houston [1st Dist.] 2006, no pet.).  

We review a trial court’s decision
to submit or refuse a particular question for an abuse of discretion.  Tex.
Dep’t of Human Servs. v. E.B., 802 S.W.2d 647, 649 (Tex. 1990); ASEP USA, 199 S.W.3d at 376.  “The test for abuse of discretion is not
whether, in the opinion of the reviewing court, the facts present an
appropriate case for the trial court’s actions. 
Rather, the question is whether the trial court acted without reference
to any guiding principles and law.”  ASEP USA, 199 S.W.3d at 376 (citing Downer v. Aquamarine Operators, Inc.,
701 S.W.2d 238, 241–42 (Tex. 1985)).  A
trial court must submit a jury question if it is supported by some evidence,
but it may refuse to do so if it is not supported by any evidence.  See
Tex. R. Civ. P. 278 (“The court
shall submit the questions . . . which are raised by the written pleadings and
the evidence.”); Elbaor v. Smith, 845
S.W.2d 240, 243 (Tex. 1992).  If there is
some evidence to support a jury question and the trial court does not submit
the question, the trial court commits reversible error.  See
Elbaor, 845 S.W.2d at 243.  In
determining whether a trial court should have submitted a question to the jury,
the reviewing court must examine the record for evidence supporting submission
of the question and ignore all evidence to the contrary.  See id.  Conflicting evidence presents a fact question
for the jury.  See Brown v. Goldstein, 685 S.W.2d 640, 641–42 (Tex. 1985).

A joint venture is similar to a
partnership, but it is ordinarily limited to a particular transaction or
enterprise.  See Adams v. Petrade Int’l, Inc., 754 S.W.2d 696, 713 (Tex. App.—Houston
[1st Dist.] 1988, writ denied); Harrington
v. Harrington, 742 S.W.2d 722, 724 (Tex. App.—Houston [1st Dist.] 1987, no
writ).  A joint venture must be based
upon an agreement, either express or implied. Coastal Plains Dev. Corp. v. Micrea, Inc., 572 S.W.2d 285, 287
(Tex. 1978).  A joint venture exists if
the parties concerned have: (1) a community of interest in the venture;
(2) an agreement to share profits; (3) an agreement to share losses;
and (4) a mutual right of control or management of the venture.  St.
Joseph Hosp. v. Wolff, 94 S.W.3d 513, 535 (Tex. 2002); Knowles v. Wright, 288 S.W.3d 136, 147 (Tex. App.—Houston [1st
Dist.] 2009, pet. denied).  “Whether a
joint venture exists is a question of law for the court’s determination.”  Swinehart
v. Stubbeman, McRae, Sealy, Laughlin & Browder, Inc., 48 S.W.3d 865,
879 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

“A joint venture does not exist if
any one of the four elements is missing.” 
Brazosport Bank of Tex. v. Oak
Park Townhouses, 889 S.W.2d 676, 683 (Tex. App.—Houston [14th Dist.] 1994,
writ denied) (citing State v. Houston
Lighting & Power Co., 609 S.W.2d 263, 268 (Tex. Civ. App.—Corpus
Christi 1980, writ ref’d n.r.e.)).  These
elements cannot be established by implication. 
Id. at 683.  If the parties do not agree to share losses,
no joint venture will be implied.  See Coastal Plains Dev. Corp., 572
S.W.2d at 288.  Thus, “[n]o joint venture
exists as a matter of law where an agreement includes a provision for sharing
profits, but no express provision for sharing losses.”  Arthur
v. Grimmett, 319 S.W.3d 711, 721 (Tex. App.—El Paso 2009, pet. denied)
(citing Gutierrez v. Yancey, 650
S.W.2d 169, 172 (Tex. App.—San Antonio 1983, no writ)); see Brazosport Bank, 889 S.W.2d at 683 (“Where the issue before the
trial court is whether a joint venture exists, proof of an agreement to share
profits does not also constitute proof of an agreement to share losses.”).

On appeal, Schechter argues that
there was evidence of each of the four elements of joint venture, and therefore
the trial court erred by refusing to submit the requested jury instruction.  Pitts argues that there is no evidence of an
agreement to share the losses; he does not contest that there is some evidence
on the other elements of joint venture.  This
issue was disputed at trial, and Schechter contends that his testimony and that
of attorney Richard Laminack constitute some evidence of an agreement to share
the losses involved in the breast-implant litigation.

Laminack testified that he had no
personal knowledge of the usual fee-splitting arrangement employed by the parties
to this lawsuit.  He also testified,
however, that it was common practice among plaintiffs’ lawyers to share losses
in mass-tort litigation.  Although
Laminack’s testimony about what he and other lawyers do is no evidence of what
Pitts and Schechter agreed to do, Schechter referred to Laminack’s testimony in
explaining the agreement he had with Pitts. 
Schechter testified, “[W]e agreed to share the profits and losses in these
cases in the manner that Mr. Laminack described basically.  That’s what I understood was happening.”

Schechter relies entirely upon
parol evidence of his own interpretation of the letter agreements to
demonstrate an agreement to share losses. 
However the letter agreements are not ambigious as to this point, and we
cannot rely upon parol evidence to create an ambiguity when none exists on the
face of the agreement.  See Nat’l Union Fire Ins., 907 S.W.2d at
520.  The letters refer to the parties’
agreement to share fees on a “fees-recovered basis,” and they are silent on the
subject of losses.  An agreement to share
profit and an agreement to share losses are separate elements necessary to the
creation of a joint venture.  St. Joseph Hosp., 94 S.W.3d at 535.  Thus, the existence of a joint venture cannot
be based on an inference that the parties agreed to share losses in some cases,
when that inference arises only from an agreement to share fees in other cases.  See,
e.g., Arthur, 319 S.W.3d at 721
(“No joint venture exists as a matter of law where an agreement includes a
provision for sharing profits, but no express provision for sharing losses.”); Brazosport Bank, 889 S.W.2d at 683; Gutierrez v. Yancey, 650 S.W.2d 169, 172
(Tex. App.—San Antonio 1983, no writ) (holding that no joint venture existed as
matter of law when contract explicitly provided for allocation of potential profits
but made no provision for sharing of losses); see also W. H. Hodges & Co. of Alexandria, Inc. v. Donley Cnty.
State Bank of Clarendon, 407 S.W.2d 221, 224 (Tex. 1966).  

Because Schechter presented no
evidence demonstrating an agreement to share losses, the trial court correctly
declined to submit a jury question on the existence of a joint venture.  Accordingly, the instruction about the duty
of good faith and fair dealing was also correctly declined, and we overrule
Schechter’s issue. 

C.  
Schechter’s
appeal concerning limitations as applied to contract claim

 

Schechter also argues that the
trial court erred by concluding that the four-year statute of limitations
applied to his contract claim and by granting judgment n.o.v. barring his
recovery of $85,610 in contract damages which accrued more than four years
before he filed suit.

A judgment notwithstanding the
verdict is proper when a directed verdict would have been proper.  Tex.
R. Civ. P. 301; Fort Bend Cnty.
Drainage Dist. v. Sbrusch, 818 S.W.2d 392, 394 (Tex. 1991).  The motion should be granted (1) when
the evidence is conclusive, and one party is entitled to recover as a matter of
law or (2) when a legal principle precludes recovery.  See Spencer
v. Eagle Stars Ins. Co. of Am., 876 S.W.2d 154, 157 (Tex. 1994).  A motion for judgment n.o.v. based on a legal
principle is appropriately granted when it is conclusively established that
recovery is precluded even though all the allegations are proven.  Schindley
v. Ne. Tex. Cmty. Coll., 13 S.W.3d 62, 65 (Tex. App.—Texarkana 2000, pet.
denied); see John Masek Corp. v. Davis,
848 S.W.2d 170, 173 (Tex. App.—Houston [1st Dist.] 1992, writ denied).  Although appellate courts ordinarily review a
trial court’s ruling on a motion for judgment n.o.v. under a no-evidence
standard of review, Wal-Mart Stores, Inc.
v. Miller, 102 S.W.3d 706, 709 (Tex. 2003) (per curiam), whether a cause of
action is barred by limitations is a question of law that appellate courts
review de novo.  Provident Life & Accident Ins. Co. v. Knott, 128 S.W.3d 211, 221
(Tex. 2003).  Because the trial court
granted Pitts’s motion for judgment n.o.v. based on the statute of limitations,
we review this issue de novo.  See id.

The limitations period for breach
of contract claims is four years.  Tex. Civ. Prac. & Rem. Code Ann. §
16.051 (West 2008); Stine v. Stewart,
80 S.W.3d 586, 592 (Tex. 2002). 
“Limitations begins to run upon accrual of the cause of action.”  Barker
v. Eckman, 213 S.W.3d 306, 311 (Tex. 2006). 
A breach of contract claim accrues when the contract is breached.  Stine,
80 S.W.3d at 592; Ambulatory Infusion
Therapy Specialist, Inc. v. N. Am. Adm’rs, Inc., 262 S.W.3d 107, 119 (Tex. App.—Houston
[1st Dist.] 2008, no pet.).  Thus,
“[w]hen recovery is sought on an obligation payable in installments, the
statute of limitations runs against each installment from the time it becomes
due.”  Hollander v. Capon, 853 S.W.2d 723, 726 (Tex. App.—Houston [1st
Dist.] 1993, writ denied).  But if the parties’
agreement contemplates a continuing contract for performance, the limitations
period does not usually commence until the contract is fully performed.  See,
e.g., Lyle v. Jane Guinn Revocable
Trust, No. 01-09-00081-CV, 2010 WL 1053060, at *10 (Tex. App.—Houston [1st
Dist.] Mar. 11, 2010, pet. denied); Intermedics,
Inc. v. Grady, 683 S.W.2d 842, 845 (Tex. App.—Houston [1st Dist.] 1984,
writ ref’d n.r.e.).

Schechter argues that the trial
court erred in applying the statute of limitations.  He contends that the nine letter agreements
comprised a continuing contract because the parties contemplated that Pitts would
share the litigation work and because the final amount of attorney’s fees could
not be distributed until all losses and unrecoverable expenses had been offset
from the total amount of attorney’s fees.

The parties anticipated that the shared
litigation work would occur over an extended period of time, but that does not
convert the agreement into a continuing contract.  This was not a class-action lawsuit in which all
of the work had to be substantially completed before any recovery could be
received.  Rather, this was a mass-tort
project that involved individual claims. 
Cf. Authorlee v. Tuboscope Vetco Int’l,
Inc., 274 S.W.3d 111, 121 (Tex. App.—Houston [1st Dist.] 2008, pet. denied)
(explaining that mass-tort settlement involved individual negotiations on
individual cases).  Therefore, Schechter’s
cause of action for breach of contract, based on Pitts’s failure to perform by
sharing the litigation work, accrued at the time of Pitts’s breach.  See,
e.g., Dell Computer Corp. v.
Rodriguez, 390 F.3d 377, 392 (5th Cir. 2004) (holding that employment
agreement was not continuing contract) (citing Sun Med. Inc. v. Overton, 864 S.W.2d 558, 560–61 (Tex. App.—Fort
Worth 1993, writ denied)).  Because we have already held that
there was no evidence that the parties agreed to share losses, we reject
Schechter’s argument that the need to offset losses against total attorney’s
fees supports the conclusion that the parties had a continuing contract.

Accordingly, we conclude that Schechter’s
contract claims were barred by limitations to the extent they accrued more than
four years before suit was filed.  We hold
that the trial court did not err by granting Pitts’s motion for judgment n.o.v.
on this issue.  We overrule this issue in
Schechter’s appeal.

D.  
Attorney’s
fees

Both parties raised issues relating
to attorney’s fees.  Pitts argues that
the trial court erred by not reducing the attorney’s fees awarded to Schechter
because of a partial settlement and because part of Schechter’s claim was
barred by the statute of limitations. 
Texas law does not allow for recovery of attorney’s fees unless
authorized by statute or contract.  Tony Gullo Motors I, L.P. v. Chapa, 212
S.W.3d 299, 310 (Tex. 2006).  “As a
result, [attorney’s] fee claimants have always been required to segregate fees
between claims for which they are recoverable and claims for which they are
not.”  Id. at 311.  However, the
party opposing an award of attorney’s fees must make a timely objection.  Green
Int’l, Inc. v. Solis, 951 S.W.2d 384, 389 (Tex. 1997) (“[I]f no one objects
to the fact that the attorney’s fees are not segregated as to specific claims,
then the objection is waived.”); Hruska
v. First State Bank of Deanville, 747 S.W.2d 783, 785 (Tex. 1988).  Such an objection must be made before the
trial court renders judgment.  See Tex.
R. App. P. 33.1(a)(1) (providing that party must make “timely request,
objection, or motion” to present complaint for appellate review); cf. Donihoo v. Lewis, No.
01-08-00277-CV, 2010 WL 1240970, at *14 (Tex. App.—Houston [1st Dist.] Mar. 25,
2010, pet. denied) (mem. op.) (holding that segregation of attorney’s fees must
be raised before trial court renders judgment).

At the charge conference, Pitts did
not object to the failure to segregate attorney’s fees or request an instruction
thereon.   Pitts
opposed Schechter’s motion to enter judgment after the jury rendered its
verdict, asserting that “one-half of the attorney fees were settled by Ed
Collard,” but this objection did not account for the fact that none of the post-settlement
fees incurred by Schechter were attributable to pursuing a claim against
Collard.  Pitts first raised his
objection to the failure to segregate attorney’s fees in his motion for new
trial and in his fourth supplemental motion for judgment n.o.v.  These two motions were filed nearly a full
month after the trial court rendered judgment. 
Because Pitts’s objection to the failure to segregate attorney’s fees
was not raised before the trial court rendered judgment, Pitts has waived this
objection on appeal.  See Tex.
R. App. P. 33.1(a), Donihoo,
2010 WL 1240970, at *14.  We overrule
Pitts’s issues relating to the award of attorney’s fees.[5]

In his appeal, Schechter argues
that the jury’s award of no attorney’s fees for his cause of action pertaining
to the interpretation of the 1995 agreement was against the great weight and
preponderance of the evidence.  This is a
complaint about factual sufficiency.  Griffin v. Carson, No. 01-08-00340-CV,
2009 WL 1493467, at *2 (Tex. App.—Houston [1st Dist.] May 28, 2009, pet.
denied) (mem. op.).  A motion for new
trial is a prerequisite to bringing a complaint on appeal alleging either that
the evidence is factually insufficient to support a jury finding or that a jury
finding is against the great weight and preponderance of the evidence.  See
Tex. R. Civ. P. 324(b)(2),
(3).  Schechter did not file a motion for
new trial.  Therefore, this issue is not
preserved for our review.  See id.; Griffin, 2009 WL 1493467, at *2. 
We overrule Schechter’s issue.

III.          
Defamation and abuse of process claims

Having resolved all the issues
pertaining to the parties’ contract claims, we now consider the issues
pertaining to Schechter’s defamation and abuse of process claims.  In response to Pitts’s lawsuit, Schechter
countersued for defamation based on statements Pitts made to the Houston City
Council and to Schechter’s professional colleagues.  Schechter later added a cause of action for
abuse of process based on the filing of a video recording of Pitts’s remarks to
city council in the underlying litigation. 
Although the trial court had ordered the parties to keep the recording
confidential, on three separate occasions Pitts filed it without placing it
under seal.  On appeal we must determine whether
the defamation claims were barred by limitations, whether the finding of
liability on the professional colleague defamation claim was supported by
sufficient evidence, and whether there was legally sufficient evidence to
support the liability finding and damages awarded on Schechter’s claim for abuse
of process.

A.  
Defamation
claim based on statements to city council

Schechter raises numerous appellate
issues related to his defamation claim based on statements Pitts made to the
Houston City Council before it confirmed Schechter’s nomination to serve as METRO
Chairman.  He contests the trial court’s
determination that his cause of action was barred by limitations and not
revived by the Civil Practice and Remedies Code.  He also addresses the sufficiency of the
evidence to support the jury’s verdict as to defamation and actual malice
relating to Pitts’s statements to city council. 
Finally, he argues that no absolute privilege applied to Pitts’s
statements before city council.

“A trial court may disregard a
jury’s verdict and render a [judgment n.o.v.] if there is no evidence to
support the jury’s findings or if a directed verdict would have been proper.”  Williams
v. Briscoe, 137 S.W.3d 120, 124 (Tex. App.—Houston [1st Dist.] 2004, no
pet.) (citing Brown v. Bank of Galveston,
963 S.W.2d 511, 513 (Tex. 1998)).  “When
a trial court specifies the ground upon which it is granting a judgment
notwithstanding the verdict, an appellant need only challenge the ground relied
upon by the trial court.”  Edascio, L.L.C. v. NextiraOne L.L.C., 264
S.W.3d 786, 795 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (citing Voskamp v. Arnoldy, 749 S.W.2d 113, 118
(Tex. App.—Houston [1st Dist.] 1987, writ denied)).  In granting judgment n.o.v. in favor of Pitts
on the city council defamation claims, the trial court expressly relied on the
statute of limitations and non-revival under section 16.069 of the Civil
Practice and Remedies Code.  Therefore
Schechter need only challenge this ground on appeal.

A defamation cause of action ordinarily
accrues on the date the defamatory matter is published or circulated.  See,
e.g., Newsom v. Brod, 89 S.W.3d
732, 736 (Tex. App.—Houston [1st Dist.] 2002, no pet.).  The limitations period for slander is one
year after the day the cause of action accrues. 
Tex. Civ. Prac. & Rem. Code
§ 16.002 (West 2002); see Newsom, 89
S.W.3d at 735–36.  However, Civil
Practice and Remedies Code section 16.069 provides an exception to the statute
of limitations applicable to compulsory counterclaims:

(a)     If
a counterclaim or cross claim arises out of the same transaction or occurrence
that is the basis of an action, a party to the action may file the counterclaim
or cross claim even though as a separate action it would be barred by
limitation on the date the party’s answer is required.

(b)     The
counterclaim or cross claim must be filed not later than the 30th day after the
date on which the party’s answer is required.

Tex. Civ. Prac. & Rem.
Code Ann. § 16.069 (West 2008).  The statute
is a savings clause, “intended to prevent a plaintiff from waiting until an
adversary’s valid claim arising from the same transaction was barred by
limitations before asserting his own claim.”  Hobbs
Trailers v. J.T. Arnett Grain Co., 560 S.W.2d 85, 88 (Tex. 1977)
(interpreting predecessor statute substantially similar to section 16.069);
accord Leasure v. Peat, Marwick, Mitchell
& Co., 722 S.W.2d 37, 38 (Tex. App.—Houston [1st Dist.] 1986, no writ);
Wells v. Dotson, 261 S.W.3d 275, 280–81
(Tex. App.—Tyler 2008, no pet.).  “We
apply a logical relationship test to determine whether counterclaims arise out
of the same transaction or occurrence.”  Commint Technical Servs., Inc. v. Quickel,
314 S.W.3d 646, 653 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (citing Jack H. Brown & Co. v. Nw. Sign Co.,
718 S.W.2d 397, 400 (Tex. App.—Dallas 1986, writ ref’d n.r.e.); accord Wells, 261 S.W.3d at 281.  The logical relationship test is met when the
same facts, which may or may not be disputed, are significant and logically
relevant to both claims.  Commint Technical Servs., 314 S.W.3d at
653.

On April 2, 2002, Pitts spoke negatively
about Schechter during the non‑agenda portion of the Houston City Council
meeting.  The gist of Pitts’s remarks was
an expression of his opinion that Schechter’s business and political affairs suggest that he is
a dishonest and unethical person.  Over three years later, on August 10, 2005,
Schechter asserted defamation as a counterclaim to Pitts’s lawsuit alleging
breach of contract.  Because Schechter
first asserted this claim more than one year after the day that Pitts allegedly
slandered Schechter at the city council meeting, Schechter’s claim was barred
by limitations.  See Tex. Civ. Prac. &
Rem. Code § 16.002; Wheeler
v. Methodist Hosp., 95 S.W.3d 628, 636 (Tex. App.—Houston [1st Dist.] 2002,
no pet.).  Nevertheless, Schechter argues
that Pitts’s statements were motivated by his disappointment about the outcome
of their failed contractual and business relationship, and that the defamation
action based on these allegations was therefore revived by section 16.069
because it arises from the same transaction as Pitts’s breach of contract
claim.

As discussed above, Pitts sued for
breach of contract alleging that he had referred certain personal-injury cases
to Schechter.  Under the referral
agreements, Schechter was to share attorney’s fees, and Pitts alleged that
Schechter failed to pay his share from the successful claims.  Schechter’s defamation claim alleged that
Pitts caused him harm by slandering him before the Houston City Council.  Accordingly, Pitts’s causes of action arise from
the contract between the parties, and Schechter’s causes of action arise from
statements Pitts made about Schechter’s fitness to serve in an appointed
position.  We conclude that the logical
relationship test is not met here and that Schechter’s defamation claims do not
arise out of the same transaction or occurrence that was the basis of Pitts’s
contract action.  See Commint Technical Srvs.,
314 S.W.3d at 653.  Therefore,
Schechter’s city-council defamation claims were barred by limitations, and we
hold that the trial court properly rendered a take-nothing judgment on this
claim.

B.  
Defamation
claim based on statements to professional colleagues

Pitts challenges the trial court’s
judgment in Schechter’s favor on the defamation claim based on statements to Schechter’s
professional colleagues.  Pitts argues
that the evidence shows that he spoke with only one of Schechter’s professional
colleagues, Richard Melancon, and that any claims based upon his statements to
Melancon were barred by limitations.  Pitts
also contends that Schechter should have obtained a jury finding on actual
malice and, in any event, the evidence is legally and factually insufficient to
establish actual malice.  He further
argues that the evidence is legally and factually insufficient to support the damages
award.

1.     Limitations

Pitts argues that the professional colleague defamation claim
is barred by limitations for the same reasons that the city council defamation
claim is time-barred.  Because
limitations is an affirmative defense, see
Tex. R. Civ. P. 94, Pitts
had the burden to “plead, prove, and secure findings to sustain [his] plea of
limitations.”  Woods v. William M. Mercer, Inc., 769 S.W.2d 515, 517 (Tex. 1988).  Unlike his statements made to city council,
Pitts’s statements to Melancon were not known to Schechter at the time they
were made, and the discovery rule applies to a defamation claim if the matter
is not public knowledge.  Wheeler, 95 S.W.3d at 636.  Pitts did not seek or obtain a determination
from the jury as to when the professional colleague statements were made.  No issue on limitations was submitted to the
jury, and Pitts did not object to this omission or request that a question on limitations
be submitted.  He has therefore waived
his limitations defense.  See Tex.
R. Civ. P. 279; see also Wise v. Anderson, 359 S.W.2d 876, 880–81
(Tex. 1962) (holding that plaintiff waived issue by failing to request jury
issues and obtain fact findings on whether defendant’s absence from state tolled
statute of limitations); Roberts v. Holmes,
412 S.W.2d 947, 949 (Tex. Civ. App.—Eastland 1966, no writ) (holding that
appellants waived limitations defense by failing to request jury question or
object to trial court’s failure to submit limitations issue).

2.    
Actual malice

In connection with the professional-colleague defamation
claim, the jury found that Schechter was harmed as a result of Pitts’s malice.  In a question predicated upon a finding that
Pitts made statements to professional colleagues of Schechter that were
defamatory per se, the jury was specifically asked whether any harm resulted
from malice.  The jury was instructed
that “malice” meant:

(a) 
a specific intent
by Gary Pitts to cause substantial injury to Arthur L. Schechter; or

(b)
an act or
omission by Gary Pitts,

(i)               
which, viewed
objectively from the standpoint of Gary Pitts at the time of its occurrence,
involved an extreme degree of risk, considering the probability and magnitude
of the potential harm to others; and

(ii)            
of which Gary
Pitts had actual, subjective awareness of the risk involved, but nevertheless
proceeded with conscious indifference to the rights, safety, or welfare of
others.

Pitts
argues that Schechter was a public figure during all times relevant to the
defamation claims, and therefore a jury finding of actual malice was required
to support the claims.  See, e.g., New York Times Co. v. Sullivan, 376 U.S. 254, 279–80, 285–86, 84 S.
Ct. 710, 726, 728–29 (1964); Turner v.
KTRK Television, Inc., 38 S.W.3d 103, 119–20 (Tex. 2000).  Pitts also argues that the evidence is
legally and factually insufficient to prove actual malice by clear and
convincing evidence.

a.    
Schechter’s public-figure status

As a threshold matter, we must resolve the question of
whether Schechter was a public figure for purposes of this claim, which he
denies.  Schechter contends that although
he had been publicly identified as one of several possible nominees to the
METRO board, there was no controversy about his nomination at the time of
Pitts’s defamatory statements.  Moreover,
Schechter points out that city council had not yet been asked to confirm him as
of the time Pitts made his presentation.

“The question of public-figure status is one of
constitutional law for courts to decide.” 
WFAA-TV, Inc. v. McLemore, 978
S.W.2d 568, 571 (Tex. 1998).  As opposed
to general-purpose public figures, “who have achieved such pervasive fame or
notoriety that they become public figures for all purposes and in all
contexts,” a limited-purpose public figure is only a public figure “for a
limited range of issues surrounding a particular public controversy.”  Id.
(citing Gertz v. Robert Welch, Inc.,
418 U.S. 323, 351, 94 S. Ct. 2997, 3012 (1974)).  We apply a three-part test to determine
whether Schechter qualified as a limited-purpose public figure:

(1) the controversy at issue must be public both in the sense that
people are discussing it and people other than the immediate participants in
the controversy are likely to feel the impact of its resolution;

(2) the plaintiff must have more than a trivial or tangential role in
the controversy; and

(3) the alleged defamation must be germane to the plaintiff's
participation in the controversy.

Id.  Schechter
easily satisfies this standard.  His
nomination to chair the METRO board was a matter of public concern that
impacted the entire Houston area. 
Pitts’s comments and the resulting controversy concerned Schechter’s
fitness to serve in that role. 
Accordingly, Schechter had a central role.  Contrary to Schechter’s suggestion, no
preexisting “controversy” was required, and we therefore hold that he was a
public figure for this purpose.  Cf. Monitor Patriot Co. v. Roy, 401 U.S.
265, 277, 91 S. Ct. 621, 628 (1971) (“a charge of criminal conduct, no matter
how remote in time or place, can never be irrelevant to an official’s or a
candidate’s fitness for office” for purposes of applying New York Times v. Sullivan); Foster
v. Laredo Newspapers, Inc., 541 S.W.2d 809, 814 (Tex. 1976).

b.   
Waiver

Schechter contends that Pitts waived his complaint about the
absence of an instruction on actual malice. 
The free-speech implications of this case require that we find waiver
only in circumstances that are “clear and compelling.”  Osterberg
v. Peca, 12 S.W.3d 31, 40 (Tex. 2000) (quoting Curtis Publ’g Co. v. Butts, 388 U.S. 130, 145, 87 S. Ct. 1975, 1986
(1967)).

Pitts argues that the gravity of his First Amendment
interests requires that our analysis consider whether the grounds for
procedural waiver of the actual-malice evidentiary standard “are adequate as a
matter of substantive federal constitutional law to protect the constitutional
interests at stake,” as required by Osterberg
v. Peca, 12 S.W.3d 31, 39–40 (Tex. 2000).[6]  In stating this rule, the Texas Supreme Court
relied upon the authority of Lawrence v.
State Tax Comm’n, 286 U.S. 276, 282, 52 S. Ct. 556, 558 (1932), quoting
that opinion for the proposition that “[e]ven though the claimed constitutional
protection be denied on nonfederal grounds, it is the province of this Court to
inquire whether the decision of the state court rests upon a fair or
substantial basis.”  Osterberg, 12 S.W.3d at 40 (quoting Lawrence, 286 U.S. at 282, 52 S. Ct. 556).  

In Lawrence, the appellant
was a Mississippi resident who challenged an amendment to the state’s excise
tax on Fourteenth Amendment equal protection grounds.  See 286
U.S. at 279, 52 S. Ct. at 556–57.  The
challenged legislation exempted from the definition of gross income “[i]ncome
of a domestic corporation, when earned from sources without this state.”  Id.  The effect of the amendment was to place
Lawrence at a competitive disadvantage as compared to his competitors operating
as corporations.  See id. at 279, 52 S. Ct. at 557. 
The Mississippi Supreme Court had avoided resolving the constitutional
challenge by concluding that “if the amendment were valid, [Lawrence] could not
complain,” and “if invalid, he would still be subject to the tax, since the act
which it amended . . . would then remain in full force, and
under it individuals and domestic corporations are taxed alike.”  Id.
at 281, 52 S. Ct. at 558.  It was in this
context that the United States Supreme Court held, as quoted by the Texas
Supreme Court in Osterberg, that
“[e]ven though the claimed constitutional protection be denied on nonfederal
grounds, it is the province of this Court to inquire whether the decision of
the state court rests upon a fair or substantial basis.”  Id.  The U.S. Supreme Court concluded in Lawrence that “the purported nonfederal
ground put forward by the state court for its refusal to decide the
constitutional question was unsubstantial and illusory.”  Id.
at 282–83, 52 S. Ct. at 558. 
Accordingly, the Court addressed the constitutional challenge to the
statute.

In contrast to the circumstances in Lawrence, Pitts’s procedural waiver in this case was neither
unsubstantial nor illusory.  Pitts filed
his original answer in response to Schechter’s defamation claim, and he
subsequently filed three amended answers. 
The appellate record reflects no pretrial motions suggesting an absence
of proof of actual malice to support a defamation claim.  See,
e.g., Tex. R. Civ. P.
166a(i).  The case was tried to a jury
over the course of three weeks.  Although
Schechter moved for a directed verdict on Pitts’s liability for defamation, the
record reflects no written response, and Pitts offered no motion of his own
suggesting a lack of evidence of actual malice.  The trial court noted on the record that after
the close of evidence at noon the prior day, the parties worked on the charge
until around 8:00 p.m. and “hammered out all of the issues.”  When offered the opportunity to formally
object to the charge, Pitts made several objections relating to the charge regarding
his claims against Schechter, but he did not object to the malice instruction on
Schechter’s defamation claim.  Pitts did
not request that the jury be instructed on actual malice, offer a substantially
correct question, or in any other way indicate that he thought the charge was
improper because Schechter was a public figure. 
See Tex. R. Civ. P. 278 (“Failure to submit a question shall not
be deemed a ground for reversal of the judgment, unless its submission, in
substantially correct wording, has been requested in writing and tendered by
the party complaining of the judgment . . . .”).  

When “the ultimate effect of sustaining a claim of waiver
might be an imposition on” the freedom of speech, we cannot find waiver except
under “clear and compelling” circumstances. 
See Curtis Pub. Co. v. Butts,
388 U.S. 130, 145, 87 S. Ct. 1975, 1986 (1967). 
However, under these circumstances, we find that Pitts’s failure to
object or otherwise suggest the correct law to the trial court was a
sufficiently clear and compelling waiver, under the ordinary procedural rules, to
require the sufficiency of the evidence to be evaluated in light of the court’s
charge as opposed to some other law that was not identified to the trial
court.  See Osterberg, 12 S.W.3d
at 55; see also Tex. R. Civ. P. 272 & 274; Tex. R. App. P. 33.1(a).  Even when fundamental constitutional rights
are at stake, the rules of appellate procedure bar review of unpreserved error
except in very narrow circumstances.  See, e.g., In re B.L.D., 113 S.W.3d 340, 352 (Tex. 2003) (applying analytical
framework of Mathews v. Eldridge, 424
U.S. 319, 335, 96 S. Ct. 893, 903 (1976), to conclude that due process does not
require appellate review of unpreserved complaints in cases involving the
termination of parental rights).  The
Texas Supreme Court has confirmed that the error-preservation rules vindicate
the State’s “strong interest in ensuring that our trial courts have an
opportunity to correct errors as a matter of judicial economy.”  Id.
at 353; see also Pirtle v. Gregory,
629 S.W.2d 919, 920 (Tex. 1982) (per curiam) (“The reason for the requirement
that a litigant preserve a trial predicate for complaint on appeal is that one
should not be permitted to waive, consent to, or neglect to complain about an
error at trial and then surprise his opponent on appeal by stating his
complaint for the first time.”).  In the
absence of any procedural due process arguments suggesting a different result
in this case, “we presume that our rules governing preservation of error in
civil cases comport with due process.”  B.L.D., 113 S.W.3d at 352.

We conclude that by failing to raise the issue in the trial
court, Pitts has waived his complaint about the absence of clear and convincing
evidence of actual malice to support a defamation claim.  We therefore overrule Pitts’s issue complaining
about the lack of such evidence. 

c.     
Actual damages

The jury awarded Schechter $100,000 for damage to his
reputation and $1,000 in pecuniary damages. 
Pitts contends that the damages award is arbitrary and not supported by
legally or factually sufficient evidence. 
He argues that Schechter suffered no reputational damages because he
repeated his defamatory statements to only one person, Melancon.  He thus contends that any presumption of
reputational damages was rebutted by evidence that Melancon already had a low
opinion of Schechter.  In support of this
argument, Pitts relies on his answer to an interrogatory, which asked him to
identify each person with whom he communicated his concerns about Schechter
becoming Chairman of METRO and the date and substance of each
communication.  He also relies on the
parties’ stipulation that Collard would not be called to testify.  Pitts states in his brief, “No one else was
alleged to have heard or been told of the statements.”

The evidence does not support the contention that Melancon
was only hearer of Pitts’s allegedly defamatory statements.  Pitts did not state in his interrogatory
responses that his communications with Schechter’s colleagues were limited to
Melancon.  Rather, he listed numerous
other people in addition to Melancon, including but not limited to five other
attorneys who had previously been associated with Schechter.  He also disclosed that he communicated to the
members of Houston City Council, anyone watching the Houston city government
cable channel at the time of his comments to Council, and co-workers his office.  Pitts stated that he repeated the substance
of his city council comments only to his wife, Collard, and Melancon, but he
also stated that he discussed Schechter’s potential METRO appointment and
possible future political ambitions with most of the other individuals
identified in the interrogatory response.

Moreover, Schechter’s testimony about his professional
colleague claim was not limited to statements that Pitts made to Melancon.  Rather, Schechter testified without objection
that his professional colleague claim related to his colleagues at METRO.

Q.      Generally, if you would,
tell the ladies and gentlemen of the jury what your defamation claim based on
the professional colleagues is.

A.      Well, professional
colleagues first in the sense of the METRO group.  As I said, I got a phone call from the
president of METRO . . . with whom I was going to be working if I got this
appointment and who was a very dynamic leader. 
She wanted to know what was going on. 
I went to the METRO offices to discuss it with several of the people
with whom I was going to be working if the appointment went through.

And this was a volunteer public-service job.  It paid nothing.  It took hours and hours of time.  And it was something I wanted to do because I
believe in public service.  I do.

And it caused me to start off in the job with a
negative, which is a very bad thing for a new chairman to have going for him or
her when they go into a public-service position like this.

Finally,
the question that was submitted to the jury, without objection, on Schechter’s
professional colleague defamation claim was not limited to Melancon.  Rather, the question asked only, “Were the
statements that Gary Pitts made to professional colleagues of Arthur L.
Schechter defamatory per se?”  The jury
was not provided a definition of “professional colleagues.”  Thus, in considering Pitts’s objection to the
sufficiency of the evidence to support damages, we are not limited to considering
defamatory statements made to Melancon. 
With this background in mind, we will consider first the necessity for
proof of damages in this case and whether any presumption of damages has been
rebutted.

A statement is defamatory per se if it injures a person in
his office, business, profession, or occupation, or if it is a false statement
that accuses him of committing a crime.  See Morrill v. Cisek, 226 S.W.3d 545,
549–50 (Tex. App.—Houston [1st Dist.] 2006, no pet.).  “Our law presumes that statements that are
defamatory per se injure the victim’s reputation and entitle him to recover
general damages, including damages for loss of reputation and mental
anguish.”  Bentley v. Bunton, 94 S.W.3d 561, 604 (Tex. 2002) (Bentley I) (citing Leyendecker & Assoc. v. Wechter, 683 S.W.2d 369, 374 (Tex.
1984)).  “Once injury to reputation is
established, a person defamed may recover general damages without proof of
other injury.”  Leyendecker, 683 S.W.2d at 374. “Non-economic damages like these
cannot be determined by mathematical precision; by their nature, they can be
determined only by the exercise of sound judgment.”  Bentley
I, 94 S.W.3d at 605.  “The amount of
damages in a defamation case is peculiarly within the province of the
fact-finder, and an appellate court will not disturb the verdict or award unless
it appears from the record to be excessive or the result of passion, prejudice,
or other improper influences.”  Morrill, 226 S.W.3d at 550.

An appellate court may review a jury’s award of damages in a
defamation case for evidentiary sufficiency. 
See Bunton v. Bentley, 153
S.W.3d 50, 53 (Tex. 2004) (Bentley II)
(holding that legally sufficient evidence supported remitted award of $150,000
for mental anguish); see also Morrill,
226 S.W.3d at 550–51 (reviewing evidence of damage to reputation for legal
sufficiency); Beaumont v. Basham, 205
S.W.3d 608, 620–21 (Tex. App.—Waco 2006, pet. denied) (reviewing legal
sufficiency of jury’s award for damage to reputation).  Thus, here we must determine whether the
evidence would enable reasonable and fair-minded people to award Schechter
$100,000 for damage to his reputation and $1,000 in pecuniary damages, see City of Keller, 168 S.W.3d at 827
(legal sufficiency), or if the evidence that supports these awards of damages
is so weak as to make the verdict clearly wrong and manifestly unjust.  See
Cain, 709 S.W.2d at 176 (factual sufficiency).

          The evidence in this case showed that
Schechter was an attorney, a former ambassador, a philanthropist, and a government
official.  The evidence also established
that Pitts defamed Schechter by saying, among other things not republished in
this opinion, that he was dishonest and unethical in the conduct of his
business and political affairs. 
Schechter also testified to the falsity of the statements that Pitts
made.  Because these statements related
to Schechter’s profession, they were defamatory per se, and Schechter was
entitled to general damages without further proof of injury, so long as the
amount of damages awarded is not excessive or the result of passion, prejudice,
or other improper influences.  See Leyendecker, 683 S.W.2d at 374; Morrill, 226 S.W.3d at 550.  Nothing in the record suggests that the
jury’s award was excessive or the result of passion, prejudice, or other
improper influences.  Therefore, this
Court may not disturb the jury’s damages award on appeal.  See
Morrill, 226 S.W.3d at 550

Although Pitts contends that Melancon’s opinion of Schechter
was so low that it could not have been injured further by anything Pitts may
have said, we have explained that this cause of action was not limited to
statements made only to Melancon.  

          We hold that there was legally and
factually sufficient evidence to support the jury’s award of non-economic
damages in the amount of $100,000. 
However, Schechter does not identify any evidence that supports the
award of $1,000 in pecuniary damages, and we find nothing in the record to support
it.  We therefore sustain Pitts’s issue
as to the pecuniary damages award and overrule his issue as to the non-economic
damages award.

d.    Exemplary damages

In addition to the $101,000 that the jury awarded in
pecuniary and non-economic damages on the professional colleague defamation
claim, the jury also awarded $300,000 in exemplary damages, which the trial
court reduced to $200,000 in accordance with Texas Civil Practice and Remedies
Code section 41.008.  Pitts contends
that there is no evidence to support this award of exemplary damages because
there is no evidence of malice under Chapter 41 of the Texas Civil Practice and
Remedies Code, which defines malice as “a specific intent by the defendant to
cause substantial injury or harm to the claimant.”  Tex.
Civ. Prac. & Rem. Code. Ann. § 41.001(8) (West 2008).

Exemplary damages only could have been awarded in this case
if Schechter proved by clear and convincing evidence that the harm resulting
from Pitts’s defamatory statements to his professional colleagues resulted from
malice.  See id. § 41.003(a)(2).  We
must “address the evidence or lack of evidence with specificity, as it relates
to the liability for or amount of exemplary damages, in light of the
requirements of [Chapter 41].”  See id.
§ 41.013. 

          Pitts argues that there is no evidence
of malice because his statements consisted only of isolated conversations
between himself and his long-time friend, Melancon.  But neither the evidence at trial nor the
charge to the jury on this issue was limited only to communications between
Pitts and Melancon.  In response to
Schechter’s discovery requests, Pitts stated that he had, in fact, made
derogatory statements about Schechter to several of Schechter’s professional
colleagues, including leveling specific allegations that accused Schechter of
dishonest, unethical, and illegal behavior. 
Schechter offered detailed testimony refuting the truthfulness of each
specific allegation Pitts made, and by its verdict, the jury indicated that it
believed Schechter.  He further testified
that the defamation caused him to “start off in the [METRO] job with a negative,
which is a very bad thing for a new chairman to have going for him or her when
they go into a public-service position like this.”

          The evidence also showed that Pitts
and Schechter were themselves engaged in a business dispute over multi-million
dollar mass litigation at the time of the defamatory statements and that
Schechter had recently won an award in mediation against Pitts.  As evidenced by his statement, Pitts, who was
not a Houston resident, attended a Houston city council meeting with the intent
to prevent Schechter’s appointment to METRO. 
This alone would be injurious to Schechter, but Pitts’s after-the-fact
repetition of defamatory statements to Schechter’s colleagues had no purpose
other than to injure Schechter’s reputation or further his cause of blocking
Schechter’s appointment to METRO, both of which represent a substantial injury
to Schechter.  

We conclude that the evidence shows that Pitts’s repetition
of false and defamatory accusations about Schechter’s business conduct showed a
specific intent to injure Schechter, and we hold that the evidence was legally
and factually sufficient to support an award of exemplary damages under Chapter
41.  We overrule Pitts’s issue contending
that there is insufficient evidence of malice.

Finally, Pitts argues that, as a matter of federal
constitutional law, the ratio of exemplary damages awarded as compared to
compensatory damages must be reduced from 2:1 to a ratio of 1:1.  Pitts relies on Exxon Shipping Company v. Baker, 554 U.S. 471, 128 S. Ct. 2605
(2008), for the proposition that when compensatory damages are “substantial,”
exemplary damages may not exceed compensatory damages as a matter of
constitutional law.  However, the Supreme
Court noted that its Exxon Shipping
decision was based on maritime law, not due process concerns.  See
Exxon Shipping, 554 U.S. at 501–02, 128 S. Ct. at 2626.  The Constitution has not been applied to
impose a maximum 1:1 ratio of exemplary to compensatory damages.  See,
e.g., State Farm Mut. Auto. Ins. Co.
v. Campbell, 538 U.S. 408, 418, 123 S. Ct. 1513, 1513 (2003); Bennett v. Reynolds, 315 S.W.3d 867,
874 (Tex. 2010).  

We overrule Pitts’s objections to
the trial court’s judgment in Schechter’s favor on the defamation claim based
on statements to Schechter’s professional colleagues.

C.   Abuse of process

Schechter alleged that Pitts also committed
the tort of abuse of process by repeatedly filing copies of a video recording
of the statements to Houston City Council that were the subject of the
defamation claim.  The record reflects
that Pitts took the position during pretrial discovery that he did not have a
copy of the recording and that he was unable to obtain one from any public
source.  He insisted that a copy be
produced to him by Schechter, who complied, designating it as being
confidential for purposes of the protective order governing the case.  The record does not reflect any objection by
Pitts to this designation of confidentiality. 


The protective order specified that
“confidential information shall not be filed with the clerk of the Court nor
included in whole or in part in pleading, motions or briefs.”  The order did permit the filing of
confidential materials under seal “should the Court need to examine them as evidence
in a hearing or other pretrial proceeding.” 
The order further provided that confidential information “shall not be
disclosed directly or indirectly to any person, including the media, other than
those authorized by this Protective Order without the consent of the
non-disclosing Party, or upon further order of the Court.”

On appeal, Pitts has not contended
that his actions were not violations of the protective order.  To the contrary, Pitts affirmatively testified
that the video recording was subject to a protective order, that he filed it
without placing it under seal, and that, in so doing, he failed to follow the
proper procedure.  On cross-examination
he agreed he was responsible for the recording being filed on three separate
occasions without being placed under seal. 
Schechter’s counsel testified that he complained to Pitts in writing
about each of the first two violations, but Pitts nevertheless continued to
attach the videorecording to his public filings.

Although Schechter suggested to the
jury that Pitts’s actions resulted in confidential information being published
in a newspaper article, no evidence was presented at trial to show that any
information published by the newspaper could be directly traced to Pitts’s
violations of the protective order.  The
only actual damages requested by Schechter were litigation costs in the amount
of $10,146.50 incurred in attempts to secure Pitts’s compliance with the
protective order and to remediate or reverse the effects of the
violations.  Schechter also sought and
obtained a jury finding by clear and convincing evidence that the abuse of
process damages resulted from Pitts’s malice.

The jury found Pitts liable to
Schechter on his claim of abuse of process and awarded $10,146.50 in actual
damages and $15,000 in exemplary damages. 
On appeal, Pitts argues that the evidence was legally and factually
insufficient to support an abuse-of-process cause of action because this claim
was improperly based on litigation conduct. 
In addition, he contends that the judgment must be reversed because
there is no evidence of special damages.

The elements of the cause of action
for abuse of process include: (1) the defendant made an illegal, improper,
perverted use of the process; (2) in so doing the defendant had an
ulterior motive or purpose; and (3) damage resulted
to the plaintiff from the irregularity.  Detenbeck v. Koester, 886 S.W.2d 477,
480 (Tex. App.—Houston [1st Dist.] 1994, writ dism’d).  To recover for abuse of process in Texas, a
claimant must demonstrate that he suffered special damages, i.e. some physical
interference with the claimant’s person or property in the form of an arrest,
attachment, injunction, or sequestration. 
See Martin v. Trevino, 578
S.W.2d 763, 766769 (Tex. Civ. App.—Corpus Christi 1978, writ ref’d n.r.e.); see also Tex. Beef Cattle Co. v. Green,
921 S.W.2d 203, 209 (Tex. 1996).  The
policy supporting this rule is that it “assures good faith litigants access to
the judicial system without fear of intimidation by a countersuit.”  Tex.
Beef Cattle, 921 S.W.2d at 209 (quoting Martin,
578 S.W.2d at 768).  The special damage
requirement also serves to avoid needless and vexatious litigation.  See id.  

Schechter claimed no damages for
abuse of process other than his legal fees incurred in the course of responding
to Pitts’s improper filings in violation of the protective order.  But for purposes of the special-injury
requirement, “[i]t is insufficient that a party has suffered the ordinary
losses incident to defending a civil suit, such as inconvenience,
embarrassment, discovery costs, and attorney’s fees.”  Id.
at 208.  Schechter’s appellate brief
identifies no other evidence of special injury. 
Accordingly, we sustain Pitts’s issues challenging the awards of
damages, including punitive damages, on Schechter’s abuse-of-process claim.

IV.          
Conclusion

We affirm the judgment of the trial court in all
respects concerning Schechter’s contract claims against Pitts.  We also affirm the judgment with respect to
non-economic and exemplary damages awarded under Schechter’s defamation claim. 
We reverse for evidentiary insufficiency that portion of the judgment
that awarded Schechter $1,000 in economic damages on his professional colleague
claim, and we render judgment that Schechter take nothing in economic damages
on that cause of action.  We also find the
evidence of special injury arising from Schechter’s claim of abuse of process
to be legally insufficient.  We therefore reverse and render judgment that
Schechter take nothing on his abuse-of-process claim against Pitts.  The judgment of the trial court is affirmed
in all other respects.

 

 

 

                                                                   Michael
Massengale

                                                                   Justice


 

Panel
consists of Chief Justice Radack and Justices Massengale and Nuchia.*











*
          Appellants and cross-appellees Gary Pitts and Pitts
& Collard, LLP have filed a motion for rehearing of our original
opinion.  Appellees and cross-appellants
Arthur L. Schechter, Arthur L. Schechter, P.C. d/b/a Schechter &
Associates, Schechter & Marshall, L.L.P., and Schechter, McElwee &
Shaffer, L.L.P. also filed a motion for rehearing.  We deny Pitts’s motion and grant Schechter’s
motion.  We withdraw our opinion and
judgment of May 12, 2011, and we issue this opinion and judgment in their
place.

 





[1]
          Pitts
& Collard’s interest in this case was assigned to Pitts because the firm
closed its business except to wind up these pending cases, and Collard settled
with Schechter on his own behalf and on behalf of his one-half interest in the
partnership.  For simplicity, some references
to “Pitts” in this opinion denote both the individual and the partnership.  Similarly, because of the unity of interests,
Schechter’s law firms may be referred to as “the Schechter parties” or
“Schechter.”





[2]
          Schechter
contends that the issue of legal sufficiency of the evidence was not preserved.  To
preserve a complaint for appellate review, a party must first demonstrate that
the complaint was made to the trial court by a timely request, objection, or
motion.  Tex. R. App. P. 33.1. 
A “no-evidence” issue is raised in the trial court and preserved for
appellate review in one of five ways: (1) a motion for instructed verdict, (2)
a motion for judgment n.o.v., (3) an objection to the submission of the issue
to the jury, (4) a motion to disregard the jury’s answer to a vital fact issue,
or (5) a motion for new trial.  T.O. Stanley Boot Co. v. Bank of El Paso,
847 S.W.2d 218, 220 (Tex. 1992); Cecil v.
Smith, 804 S.W.2d 509, 510–11 (Tex. 1991); El-Khoury v. Kheir, 241 S.W.3d 82, 86 (Tex. App.—Houston [1st
Dist.] 2007, pet. denied).  Pitts filed five motions for judgment n.o.v.,
in which he argued that there was no evidence or jury finding that he breached
the nine letter agreements, that there was no evidence that the alleged breach
was material, and that Schechter waived the excuse of prior repudiation by not
promptly suing Pitts and instead waiting for Pitts’s performance under the
contract.  In addition, Pitts argued at
length in his initial motion for judgment n.o.v. that the nine letter
agreements were an integrated contract and were not ambiguous, therefore the
jury should not have been permitted to consider parol evidence in determining
whether Pitts breached the contract and whether his breach preceded Schechter’s
contractual breach.  Pitts also filed a
motion for new trial, in which he argued, among other things, that the evidence
was legally and factually insufficient to support the jury’s answers on these
issues.  Pitts’s motions for judgment
n.o.v. and his motion for new trial were sufficient to inform the trial court
of the complaints he now raises on appeal, i.e., that there was no evidence to
support Schechter’s affirmative defenses and that he did not breach the nine
letter agreements because they unambiguously do not require him to share the
work.  Thus, we conclude that these issues
are preserved for our review.

 





[3]
          In his motion for new trial, as on appeal, Pitts
argued that the evidence was factually insufficient to support the jury’s
finding as to Schechter’s affirmative defenses. 
The standard of review of the denial of a motion for new trial is abuse
of discretion.  Champion Int’l Corp. v. Twelfth Court of Appeals, 762 S.W.2d 898,
899 (Tex. 1988) (orig. proceeding).  A
trial court abuses its discretion when it acts in an arbitrary or unreasonable
manner, or if it acts without reference to any guiding rules or principles.  Downer
v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241–42 (Tex. 1985).

 





[4]          Pitts also contends that
Schechter receives a double-recovery windfall if he is permitted to keep the
full measure of attorney’s fees he collected from the breast-implant clients
and also recover damages from Pitts for out-of-pocket expenses to hire extra
employees to do the work that Pitts failed to perform.  This argument does not directly support the
issue raised by Pitts, i.e. that Schechter had a continuing contractual
obligation to split the fees collected.  The
windfall complaint instead goes to the measure of damages awarded for Pitts’s
breach—a matter not contested through an issue challenging the legal or factual
sufficiency of the evidence to support the amount of the award.

 





[5]
          In
the sole issue addressed by Pitts’s motion for rehearing, Pitts contends that
the parties agreed and stipulated before trial that any recovery by Schechter,
including any recovery for attorney’s fees, would be reduced by half to account
for Schechter’s settlement with Collard. 
We have reviewed the record excerpts relied upon by Pitts, and it is
apparent that the context of the relevant stipulation was a discussion of
Pitts’s motion in limine and Pitts’s damages claims against Schechter.  Although the parties did agree to refrain
from mentioning the Collard settlement, they only discussed reducing any jury
award on Pitts’s claims for damages, and in particular there was no discussion
about the effect on a jury award on Schechter’s claims for attorney’s
fees.  The discussion culminated with the
trial court stating: “the way to
resolve this is that this is a suit brought by Pitts & Collard for
100 percent and then with the agreement of everybody that at the end of
the day, however much the jury awards, we cut it in half.”  Counsel for both Pitts and Schechter
indicated their agreement on the record. 
The stipulation thus did not relate to the Collard settlement’s effect
on any claim asserted by Schechter.

 





[6]
          Our
original opinion interpreted this language in Osterberg to require that we “‘make an independent examination of
the whole record’ so as to ensure that ‘the judgment does not constitute a
forbidden intrusion on the field of free expression.’”  E.g.,
Snyder v. Phelps, 131 S. Ct. 1207,
1216 (2011); Bose Corp. v. Consumers
Union of U.S., Inc., 466 U.S. 485, 499, 104 S. Ct. 1949, 1958 (1984); New York Times, 376 U.S. at 285, 84 S.
Ct. at 728.  In light of additional
briefing provided by the parties on Schechter’s motion for rehearing, and for
the reasons provided above, we now conclude that Osterburg does not require a de novo review in response to an
allegation of procedural waiver of the First Amendment requirement of clear and
convincing evidence of actual malice to support a public figure’s defamation
claim.

 





*
          The
Honorable Sam Nuchia, Senior Justice, Court of Appeals for the First District
of Texas, sitting by assignment.